**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Crim. No. 08-307 (RHK/JJK) |
| Plaintiff, | |
| v. | |
| Nicolas Mellado-Evanguelista, also known as Miguel Campos-Cardoso, also known as Santiago Martinez, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Tricia A. Tingle, Esq., Assistant United States Attorney, counsel for Plaintiff.

Andrew H. Mohring, Esq., Office of the Federal Defender, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

## I.      INTRODUCTION

This matter is before the undersigned Magistrate Judge on Defendant

Nicolas Mellado-Evanguelista's Motion to Suppress September 4 and September

9, 2008, Statements, Admissions, and Answers (Doc. No. 18).  This Court held a

hearing on November 13, 2008, and received testimony from one witness,

Immigration and Customs Enforcement ("ICE") Agent Nicholas Carey.  The

matter was referred to the undersigned for Report and Recommendation

pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons stated below,

this Court recommends that Defendant's Motion to Suppress September 4 and September 9, 2008, Statements, Admissions, and Answers be granted.

## II.    BACKGROUND

On September 17, 2008, the Government charged Defendant by criminal complaint with illegally reentering the United States after being previously deported in violation of 8 U.S.C. § 1326(a) and (b)(2).  Approximately two weeks prior to this charge, on September 4, 2008, Defendant had been arrested in Hennepin County for possession of drugs and driving while impaired.  (Doc. No. 1, ¶ 3.)  On that day, Defendant was being held in Hennepin County Jail for the state charges when, during the County's booking procedures, Defendant indicated that he had been born in Mexico.  (Doc. No. 26, Tr. of Proceedings ("Tr.") 11-12.)

As part of an ICE program to identify undocumented persons within the United States in violation of the immigration laws, ICE Agent Carey went to Hennepin County Jail on September 4, 2008, to speak with anyone in the County's custody who had acknowledged foreign citizenship.  (Tr. 10, 26-27.)  At the jail, Agent Carey conducted an interview with Defendant that consisted of the following questions: (1) what is Defendant's country of citizenship; (2) what is his correct name; (3) whether Defendant had any documents that legally allowed him in the United States; (4) what was the city of Defendant's birth; and (5) whether or not Defendant had been deported or removed from the United States in the past.  It is undisputed that Agent Carey did not inform Defendant of the *Miranda*

warnings prior to asking these questions.  Agent Carey testified that his purpose

in interviewing Defendant was to prepare files for administrative proceedings

regarding deportation decisions to be made by an immigration judge (Tr. 9-10),

and therefore it was his understanding that *Miranda* warnings were not required.

(Tr. 15.)

Agent Carey checked ICE records, which revealed that Defendant had been

previously removed from the United States in March 2003, following an arrest

and conviction for drug trafficking in Ohio.  (Defendant's Ex. 1 at 2.)[1]  Because

Agent Carey, as a result of Defendant's statements on September 4 and the

records check, determined that Defendant was not legally in the United States,

he decided that Defendant should be taken into ICE custody.  (Tr. 15-16, 18.)

ICE took Defendant into custody on September 9, 2008, and transported

Defendant to an ICE facility to conduct a second interview.  Agent Carey

described the second interview as being part of the same type of administrative

process as the first interview on September 4.  (Tr. 18-19.)

Prior to conducting the second interview, from an ICE interview form, Agent

Carey read Defendant warnings in both English and Spanish which included the

following:

---

[1]      Based on the record, it appears that Carey learned of Defendant's prior
removal from the United States by checking ICE records after conducting the
September 4, 2008 interview.  (*See* Defendant's Ex. 1 at 2.)  Carey testified that
at the time of the initial interview, he did not yet know Defendant's actual first
name (Tr. 27), suggesting that the search of ICE records was conducted after the
initial interview to verify information Carey learned during that interview.

> You have the right to remain silent.
>
> . . . .
>
> You have the right to talk to a lawyer for advice before we ask you any questions and to have him present with you during questioning.
>
> . . . .
>
> Anything you say can be used against you *in court*, or in any immigration or administrative proceeding.

(Government's Ex. 1 (emphasis added).)  Defendant indicated to Agent Carey that he understood these rights, and Agent Carey wrote Defendant's responses to the questions that followed on the form.  (Tr. 19-20.)  Defendant's responses indicated his true name, that he was born in Mexico, that he last entered the United States at El Paso, TX, on foot, that he was not admitted by an immigration officer and did not have any immigration documents permitting him to be in the United States, that he had previously been arrested in Ohio in 2003, and that he had previously been deported in March 2003.  (Government's Ex. 1 at 1-2.)  Near the end of the form, Defendant responded to a question asking for any further comments by stating "Sorry for this."  (*Id.* at 3.)  Sometime after the September 9, 2008 interview, Defendant was referred for criminal prosecution by a criminal investigator of ICE.  (Tr. 34.)

On October 29, 2008, Defendant moved to suppress both statements in this case on the grounds that they were taken in violation of his Fifth Amendment right not to "be compelled in any criminal case to be a witness against himself" and other constitutional rights protected through the requirement of *Miranda*

4

warnings.  At the November 13, 2008 hearing, the Government conceded that

Defendant was in custody during both the September 4 and September 9

interviews.  (Tr. 28.)  Both parties have submitted post-hearing briefs as

requested by the Court at the hearing.[2]

## III.    DISCUSSION

## A.    Suppression of September 4, 2008 Statements

The Government argues that Defendant's September 4 statements are

admissible because Agent Carey was conducting what he thought was a civil or

administrative investigation related to a possible deportation of an illegal alien, a

decision that would ultimately be made by an immigration judge.  (Doc. No. 30 at

5.)  The Government cites *Trias-Hernandez v. Immigration and Naturalization*

*Serv.*, 528 F.2d 366 (9th Cir. 1975), and *Nai Cheng Chen v. Immigration and*

*Naturalization Serv.*, 537 F.2d 566 (1st Cir. 1976), for the proposition that

*Miranda* warnings are not required before questioning in the context of a civil

deportation hearing.  However, these cases are inapposite.  They concern the

admissibility of unwarned statements to INS investigators at a subsequent civil

deportation hearing before an immigration judge.  They do not involve, as this

---

[2]     The sole issue this Court addresses here is whether Defendant's statements made in response to the interviews on September 4 and September 9, 2008, may be use by the Government against Defendant in the Government's case-in-chief.  This does not address whether the factual information in Defendant's answers, such as Defendant's true name, prior deportations, and details about his unauthorized reentry should be admitted into evidence because, for example, these facts would have inevitably been discovered from lawful investigatory activities of ICE agents.  *See Nix v. Williams*, 467 U.S. 431 (1984).

case does, the use of such statements against a defendant in a criminal trial.

The focus of the concern here must be on the application of Defendant's

constitutional rights in a criminal trial; for example, the Fifth Amendment says that

"no person shall be compelled in any *criminal case* to be a witness against

himself."  U.S. Const. amend. V (emphasis added).  The distinction between

criminal and civil proceedings is critical because the reason why *Miranda*

warnings are not required for the admission in deportation hearings of statements

to immigration investigators is that such hearings are civil, not criminal

proceedings.  *Trias-Hernandez*, 528 F.2d at 368-69.  This is underscored by the

conclusion of the plurality in *Chavez v. Martinez*, 538 U.S. 760, 766 (2003), that

no self-incrimination violation occurs when an incriminating statement is obtained

in violation of *Miranda* unless and until it is admitted against the maker in a

criminal trial.

The Fifth Amendment privilege against self-incrimination protects

individuals from being forced to testify against themselves.  U.S. Const.

amend. V.  *Miranda* warnings must be given before any interrogation of a

suspect in custody may take place.  *Miranda v. Arizona*, 384 U.S. 436, 460-61

(1966).  Before the government may introduce an incriminating statement made

by a defendant, it must prove a voluntary, knowing, and intelligent waiver of the

accused's rights under the Fifth Amendment.  *Id.* at 475.  "Even one whose

presence in this country is unlawful, involuntary, or transitory is entitled to that

constitutional protection [under the Fifth Amendment]."  *Matthews v. Diaz*, 426

U.S. 67, 77 (1976).

The requirements of *Miranda* arise only when a defendant is both in

custody and being interrogated.  *United States. v. Head*, 407 F.3d 925, 928 (8th

Cir. 2005).  Because it is undisputed that Defendant was in custody and had not

yet been advised of his rights when the September 4 interview took place, the

issue is whether any statements made by Defendant at that interview resulted

from interrogation.[3]  *See United States v. Briones*, 390 F.3d 610, 612 (8th Cir.

2004).  Interrogation includes both direct questioning by officers and words or

actions that officers should know are "'reasonably likely to elicit an incriminating

response from the suspect.'"  *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291,

301 (1980)).

Essentially, the Government argues that Defendant was not subject to

"interrogation" during the September 4 interview because the purpose of Agent

Carey's questioning was to gather information for a civil or administrative

deportation hearing before an immigration judge, not to gather evidence for use

in a criminal trial.  The Government has not provided, and this Court has not

found, any Eighth Circuit case directly supporting this proposition.  As Defendant

points out, the Ninth Circuit rejected this argument on facts similar to those

---

[3]     As noted above, the Government stipulated at the hearing that Defendant
was in custody at the time of both the September 4 and September 9, 2008
interviews and it did not raise a custody issue in its post-hearing brief.  (Tr. 28;
Doc. No. 30.)

involved here in *United States v. Mata-Abundiz*, 717 F.2d 1277 (9th Cir. 1983).

In *Mata-Abundiz*, the defendant Mata was arrested and charged with a violation

of state statutes against carrying a concealed weapon and possession of a

firearm by an alien.  *Id.* at 1278.  While Mata was in jail on the state charges, an

immigration official, who had access to Mata's booking information, visited Mata

to obtain biographical information about his immigration status.  *Id.*  The

immigration official asked Mata about his citizenship and Mata responded that he

was a citizen of Mexico.  *Id.*  The Ninth Circuit rejected the Government's

argument that the immigration official's question regarding Mata's citizenship was

not interrogation due to the "civil" nature of the investigation because the

immigration official "had reason to know that any admission of alienage by Mata

would be highly incriminating"—such admissions *could* subject Mata to federal

prosecution on charges for which his alienage was an essential element.  *Id.* at

1279.  The court reasoned that "[i]f civil investigations by the [Immigration and

Naturalization Service] were excluded from the *Miranda* rule, [immigration]

agents could evade that rule by labeling all investigations civil."  *Id.*  The Ninth

Circuit noted that not all unwarned statements were inadmissible, but that the

inquiry turned on whether there was interrogation within the meaning of *Miranda*.

*Id.*

The Ninth Circuit later distinguished *Mata-Abundiz* in *United States v.*

*Salgado*, 292 F.3d 1169 (9th Cir. 2002).  In *Salgado*, the defendant Salgado had

been arrested on state charges unrelated to his immigration status, and while

held in a state facility, a federal immigration officer was referred to Salgado by

state officials based on his statement that he had been born outside the United

States.  292 F.3d at 1171.  The immigration officer interviewed Salgado at the jail

without providing *Miranda* warnings—the officer's stated purpose for conducting

the interview was to determine whether Salgado was subject to administrative

action for deportation.  *Id.*  Salgado provided information that he was a citizen

and national of Mexico and that he entered the United States without

documentation or inspection near a valid port of entry in California.  *Id.*  Salgado

was subsequently deported.  *Id.*  Within one year after this deportation, Salgado

illegally reentered the United States, was again arrested on state charges

unrelated to his immigration status, and the statements he had previously made

to the immigration officer were admitted over his objection in a trial for the crime

of illegal reentry after deportation.  *Id.* at 1172.  The Ninth Circuit affirmed the

district court's decision to admit the statements on the ground that the

immigration officer could not reasonably have suspected that the questions she

asked Salgado were likely to elicit a response that would become incriminating

upon Salgado's future illegal return to the United States.  *Id.* at 1173; *see also*

*United States v. Rodriguez*, 356 F.3d 254 (2d Cir. 2004) (applying similar

reasoning); *United States v. Solano-Godines*, 120 F.3d 957, 962 (9th Cir. 1997)

(same).  Here, unlike *Salgado*, Defendant was asked to provide incriminating

information about allegedly illegal conduct which had already occurred and for

which criminal charges were promptly brought after, and as a result of, Agent

Carey's questioning of Defendant.

The key inquiry of these cases, and the one on which this Court must

focus, is whether the immigration officer conducting an interview for

administrative purposes knows or should know that the questions asked would

elicit incriminating responses. This focus is consistent with the definition of

interrogation in this circuit. *See Briones*, 390 F.3d at 612 (defining interrogation

as "express questioning and . . . words or conduct that officers should know is

reasonably likely to elicit an incriminating response from the suspect") (internal

quotations omitted). Other courts have taken the same approach regarding this

issue. *See, e.g.*, *United States v. Arango-Chairez*, 875 F. Supp. 609, 611, 616

(D. Neb. 1994) (finding that unwarned statements made to an ICE officer who

interviewed the defendant shortly after he was taken into custody at a state

correctional center for traffic violations were "interrogation" because the

immigration officer should have known that his questions were reasonably likely

to elicit an incriminating response). Agent Carey stated that his investigation was

purely administrative in nature, and that he was not involved in the referral of

Defendant's case for criminal charges. However, as noted above, the

Government cannot avoid the requirements of *Miranda* simply by labeling

immigration investigations "civil" or "administrative" when its agents know or

reasonably should know that the questions they ask in the course of such

investigations are likely to elicit incriminating responses. *See Mata-Abundiz*, 717

10

F.2d at 1280 ("[T]he investigator cannot control the constitutional question by placing a 'civil' label on the investigation.").

The difficulty in these cases is striking the appropriate balance between the need for immigration authorities to effectively discharge their duties with respect to the administration of our immigration laws and the constitutional prohibition against self-incrimination.  On the one hand, immigration authorities have a legitimate administrative responsibility to ascertain the legality of an individual's presence in the United States by investigating a person's immigration status.  On the other, an individual's immigration status is often directly relevant to an element of a crime that immigration officials are in the business of investigating.  Striking that balance, however, does not require the establishment of a new framework or special rules related to the custodial interrogation of persons by immigration officers.  The test to determine whether an individual has been subjected to interrogation is sufficient to address this dilemma.  Therefore, this Court will consider whether Agent Carey knew or reasonably should have known that the questions he asked Defendant during the September 4 interview were reasonably likely to elicit an incriminating response.

At the time of Agent Carey's interview with Defendant on September 4, Agent Carey had already learned some information from Defendant's booking sheet prepared by state law enforcement officers in connection with Defendant's arrest and detention on state charges.  Based on that information, Agent Carey knew that Defendant claimed to have been born in Mexico.  Agent Carey then

11

asked Defendant of what country he was a citizen, what his correct name was,

where he was born, whether he had any documents legally showing he was

allowed in the United States, and whether or not he had been deported or

removed from the Untied States in the past.

The investigation does not have to be aimed at eliciting incriminating

statements about whether a specific crime was committed for the *Miranda*

protections against unconstitutional self-incrimination to be triggered.  In *Mathis*

*v. United States*, 391 U.S. 1 (1968), for example, the defendant was in state

custody when he was questioned by an Internal Revenue Service agent as part

of what the Government characterized as a "routine tax investigation where no

criminal proceedings might even be brought."  *Id.* at 4.  The Court found the

Government's asserted distinction between its civil and criminal investigations

unpersuasive and rejected "the contention that tax investigations are immune

from the *Miranda* requirements for warnings to be given a person in custody."  *Id.*

Further, the Court stated that it found "nothing in the *Miranda* opinion which calls

for a curtailment of the warnings to be given persons under interrogation by

officers based on the reason why the person is in custody."  *Id.* at 4-5.  The

Court's observation in *Mathis* that "tax investigations frequently lead to criminal

prosecutions" holds equally true under these circumstances—civil immigration

investigations frequently lead to criminal prosecutions.  *See id.* at 4.  It follows

from the Court's decision in *Mathis* that even if Agent Carey's investigation was

aimed at gathering information for a deportation hearing rather than for

prosecution of a specific crime, his questioning could still amount to interrogation for *Miranda* purposes.

In this case, Agent Carey was eliciting information from Defendant that obviously could be self-incriminating in light of the immigration laws of the United States. While the nature of the violation of the immigration laws—which could range from the civil/administrative charge of deportation to felony criminal charges for illegal reentry—remained to be seen at the time of the September 4 interview, no penalty was ruled out. Indeed, Agent Carey had an obligation to gather all the potentially incriminating information about Defendant's illegal presence in the United States so that the immigration laws could be effectively and swiftly enforced. And this Court cannot lose sight of the fact that Agent Carey was interviewing an alien who was arrested and held in jail on cause to believe that he had committed a drug crime. This certainly added to the likelihood that any information Defendant disclosed about his illegal presence in the United States would, or at least could, be used against him in a criminal context. Although *Miranda* warnings may not have been necessary before such self-incriminating statements were used in an administrative removal proceeding before an immigration judge, they are required by the Fifth Amendment in the context of a criminal trial.

As an ICE investigator for civil or administrative deportation hearings, Agent Carey is or should be familiar with the immigration laws of the United States, including those that carry criminal penalties. In fact, Agent Carey

admitted that he was aware that an individual's presence in the United States illegally is a crime.[4]  (Tr 27.)  But the test for whether there has been an interrogation is an objective one: is the question asked likely to elicit an incriminating response.  The subjective intent of the agent may be relevant but it is not conclusive.  *Mata-Abundiz*, 717 F.2d at 1280.  Viewed objectively, Agent Carey's questions had a direct bearing on potential federal prosecution for crimes of which Defendant's immigration status would be an essential element, in particular questions about whether Defendant was lawfully in this country and whether he had ever been deported in the past.  *See Mata-Abundiz*, 717 F.2d at 1279.

The best evidence that Agent Carey knew or should have known that the information being elicited from Defendant on September 4 could be used against him in a criminal case is in the written warning that was given to Defendant on September 9 after he was taken into ICE administrative detention.  The September 9 warning specifically included the language that "anything you say can be used against you in court, or in any immigration or administrative proceeding."  (Gov't Ex. 1.)  The Government asserts that on September 9, just like on September 4, all that was going on was the collection of information from

---

4       Presumably, by responding positively to defense counsel's question (Tr. 27), Carey was referring to 8 U.S.C. § 1325, which provides criminal penalties for any alien who enters or attempts to enter the United States at any time or place other than as designated by immigration officers and other manner of illegal entry.

Defendant – information that might be used against him in an administrative

deportation proceeding.  Yet it is clear that ICE contemplated that any such

information collected from Defendant could *also* be used "in court"; there was no

restriction placed on how or where self-incriminating information provided by

Defendant could be used.  Given the fact that the Government does not

distinguish the nature or purpose of the September 4 and September 9

interviews, this Court must conclude that both were aimed at eliciting potentially

incriminating information to be used against Defendant in any forum in which the

Government chose to bring an action for violation of the immigration laws,

whether it be "in court, or in any immigration or administrative proceeding."

Under these circumstances, this Court concludes that Agent Carey, at a

minimum, should have known that the questions he asked during the September

4 interview were likely to elicit incriminating responses.

Defendant also argues that under the circumstances in this case, the

questions Agent Carey asked fall outside the booking exception because Agent

Carey should reasonably have been aware that the information sought would be

directly relevant to a substantive offense likely to be charged.  (*See* Doc. No. 29

at 6.)  Typically, *Miranda* warnings are not required for routine booking questions

because questions asked for routine information necessary for basic

identification purposes rarely elicit an incriminating response.  *See United States*

*v. McLaughlin*, 777 F.2d 388 (8th Cir. 1985) (noting that "a request for routine

information necessary for basic identification purposes is not interrogation under

*Miranda*, even if the information turns out to be incriminating").  However, "while

there is usually nothing objectionable about asking a detainee his place of birth,

the same question assumes a completely different character when an

[immigration] agent asks it of a person he suspects is an illegal alien."  *United*

*States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993) (citing *United States v.*

*Gonzalez-Sandoval*, 894 F.2d 1043, 1046-47 (9th Cir. 1990), *United States v.*

*Equihua-Juarez*, 851 F.2d 1222, 1225-26 (9th Cir. 1988), and *Mata-Abundiz*, 717

F.2d at 1280); *see also United States v. Aragon-Ruiz*, 551 F.Supp. 2d 904, 933

(D. Minn. 2008) (citing *Henley*, 984 F.2d at 1042).

Here, it is important that Agent Carey's questions were not part of any

normal booking procedure.  Indeed, Defendant had already been booked at the

time of the September 4 interview, and Agent Carey had the state's booking

information prior to that interview.  Thus, the questioning conducted for the

purpose of gathering Defendant's routine biographical information had already

occurred before Agent Carey's initial meeting with Defendant.  Therefore, the

booking exception does not apply to Agent Carey's questioning at the September

4 interrogation.  For all the foregoing reasons, this Court recommends that

Defendant's motion be granted to the extent that Defendant's statements during

the September 4, 2008 interrogation be excluded at trial from use in the

Government's case-in-chief.

**B.     Suppression of the September 9, 2008 Statements**

Defendant also argues that the statements made by Defendant during the September 9, 2008 interview must be suppressed because they were preceded by inadequate *Miranda* warnings.  (Doc. No. 29 at 7-9.)  Defendant identifies two asserted defects with the warnings he received: (1) neither the form used nor Agent Carey mentioned Defendant's right to have court-appointed counsel; and (2) neither Agent Carey nor the form used informed Defendant that the statements he made both could and *would* be used against him in court.  (*Id.* at 8-9.)  The Government does not directly address the adequacy of the warnings provided to Defendant; rather, the Government argues that "it is clear that [Agent Carey] was there for a civil proceeding but was required to provide the defendant with the administrative requirements that he could contact his consulate and have an attorney if he so desired."  (Doc. No. 30 at 6.)  Apparently the Government contends that the asserted civil or administrative nature of the investigation eliminates any requirement that *Miranda* warnings be given at all, regardless of the subsequent attempt to use unwarned statements at a subsequent criminal trial.  However, as discussed above, the Government offers no relevant support for such contention.

The Fifth Amendment prohibits the use of self-incriminating statements obtained during custodial interrogation in a criminal trial, unless there is a voluntary, knowing, and intelligent waiver of the defendant's *Miranda* rights. *Miranda*, 384 U.S. 436.  The Supreme Court "has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a

criminal defendant." *United States v. Caldwell*, 954 F.2d 496, 501 (8th Cir. 1992)

(quoting *California v. Prysock*, 453 U.S. 355, 359 (1981)).  In *Caldwell* the Eighth

Circuit stated:

> *Miranda* itself indicates that no talismanic incantation is required to satisfy its strictures. *Prysock* recognized that *Miranda* announced procedural safeguards including the now familiar *Miranda* warnings *or their equivalent*. . . . [R]eviewing courts need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*.

954 F.2d at 501-02 (quotations, alterations, and citations omitted) (emphasis in

original).

Therefore, Defendant's contention that the *Miranda* warnings provided

were deficient for failing to inform him that his statements *will* be used against

him is without merit.  Defendant's reliance on *Estelle v. Smith*, 451 U.S. 454

(1981), is misplaced.  There, the Supreme Court did not conclude that *Miranda*

warnings are insufficient where they do not expressly inform the defendant that

his statements *will* be used against him; rather it concluded that *Miranda*

warnings are required during the penalty phase of a bifurcated death penalty trial

in order to use a defendant's statements to a psychiatrist pursuant to a court

ordered evaluation.  *Id.* at 469.  Here the *Miranda* warnings provided to

Defendant informed him that that the statements he made can be used against

him in court or any administrative proceedings.  This warning was sufficient to

apprise Defendant of the ramifications of answering Agent Carey's questions and

therefore "reasonably convey[ed] his rights as required by *Miranda*."  *See*

*Caldwell*, 954 F.2d at 502.

Defendant's contention that the *Miranda* warnings were deficient for failure

to warn him that he had the right to a court-appointed attorney, however,

compels a different conclusion.  Defendant was informed that he had the right to

talk to a lawyer for advice before Agent Carey asked him any questions and to

have counsel present with him during questioning.  Defendant was not informed,

however, that were he unable to afford an attorney, one would be appointed for

him.  In *Miranda*, the Court stated the following about the need for a warning on

the availability of court-appointed counsel for the indigent:

> In order fully to apprise a person interrogated of the extent of his
> rights under this system then, it is necessary to warn him not only
> that he has the right to consult with an attorney, but also that if he is
> indigent a lawyer will be appointed to represent him.  Without this
> additional warning, the admonition of the right to consult with
> counsel would often be understood as meaning only that he can
> consult with a lawyer if he has one or has the funds to obtain one.
> The warning of a right to counsel would be hollow if not couched in
> terms that would convey to the indigent—the person most often
> subjected to interrogation—the knowledge that he too has a right to
> have counsel present.  As with the warnings of the right to remain
> silent and of the general right to counsel, *only by effective and
> express explanation to the indigent of this right* can there be
> assurance that he was truly in a position to exercise it.

384 U.S. at 473 (emphasis added).

Failure to inform a defendant that an attorney will be appointed for him by

the court should he be unable to afford to pay for the services of counsel, strips

the *Miranda* warnings of an essential admonition.  While no "talismanic

19

incantation" of the *Miranda* warnings is required, *Prysock*, 453 U.S. at 359, here,

the warning provided to Defendant did not reasonably convey Defendant's right

to have a court-appointed attorney present, and therefore was inadequate under

*Miranda*.  *See Caldwell*, 954 F.2d at 502.  For this reason, this Court

recommends that Defendant's statements during the September 9, 2008

interview be suppressed.

## IV.     RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1.     Defendant's Motion to Suppress September 4 and September 9,

2008, Statements, Admissions, and Answers (Doc. No. 18) be **GRANTED**.


Date: January 6, 2009

                                                          *s/Jeffrey J. Keyes*
                                                          JEFFREY J. KEYES
                                                          United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
January 21, 2009, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within ten days after service thereof.  All briefs filed under
this rule shall be limited to 3500 words.  A judge shall make a de novo
determination of those portions of the Report to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable directly to the Circuit Court of
Appeals.